1
2
3
4                                          *E-FILED - 8/2/10*
5
6
7
8                    IN THE UNITED STATES DISTRICT COURT
9            FOR THE NORTHERN DISTRICT OF CALIFORNIA

10   MICHAEL WAYNE DAVIS,              )     No. C 09-0387 RMW (PR)
                                       )
                    Petitioner,        )     ORDER DENYING PETITION FOR
11                                     )     WRIT OF HABEAS CORPUS;
         vs.                           )     DENYING CERTIFICATE OF
12                                     )     APPEALABILITY
                                       )
13   WARDEN BEN CURRY,                 )
                                       )
14                  Respondent.        )
     _____)
15

16       Petitioner, a state prisoner proceeding pro se, sought a writ of habeas corpus pursuant to

17   28 U.S.C. § 2254 challenging a decision by the California Board of Parole Hearings ("Board") in

18   finding him unsuitable for parole. Respondent was ordered to show cause why the writ should

19   not be granted. Respondent has filed an answer, along with a supporting memorandum of points

20   and authorities and exhibits. Petitioner has responded with a traverse. For the reasons set forth

21   below, the petition for a writ of habeas corpus is **DENIED**.

22                                  **BACKGROUND**[1]

23   A.    Commitment Offense

24         1.    Official Version

25   On June 14, 1986, Jaynee Alison Waters, a 16-year old girl, was found lying in an alley

26

27   _____

28       [1] The relevant facts are taken from the Transcript of the January 11, 2007 Subsequent
     Parole Consideration Hearing. (Transcript ("Tr.") at 19-21, 22-68..)

in Los Angeles screaming and moving her head back and forth. (Tr. at 19-20.) Witnesses

observed blood on her face. (Id. at 20.) Waters had a puncture wound to her right cheek and

blood on her face and chest. (Id.) While she was en route to the hospital, she stated that she had

been stabbed but did not give any other information. (Id.) Later, she also stated that she was the

victim of oral, vaginal, and anal assaults by one male. (Id.) In the early morning hours on June

15, 1986, Waters died. (Id.) The police were able to discover that Waters was last seen with

petitioner. (Id.) When police contacted petitioner, he was hesitant to meet them and although he

promised to go to the police station for questioning, he did not. (Id.) Instead, petitioner fled the

area and was not arrested until two months later when he was arrested for being drunk, which led

to the discovery that he had an outstanding warrant from a murder charge. (Id. at 20-21.)

Petitioner pleaded guilty to second degree murder with the use of a deadly weapon. (Id.

at 3, 23.) The state court sentenced him to 16-years to life. (Id. at 3.)

2.    Petitioner's version

On June 14, 1986, on his way to a friend's house, petitioner ran into Jeffrey Williams,

another friend. (Id. at 24.) Petitioner picked up Williams to accompany him to the friend's

house. (Id.) On the way, they saw Waters and Williams' brother at a bus stop, so petitioner

stopped. (Id.) Waters asked where her boyfriend, Mr. McGowey, was and Williams said he

might know the whereabouts of McGowey, so Waters got into the car and they proceeded to the

area where Williams believed McGowey would be. (Id. at 24-25.) They found McGowey and

McGowey also got into the car with them. (Id. at 25.) They dropped McGowey off at his house

and then proceeded to Williams' sister's house. (Id.) They were drinking and smoking

marijuana until Williams' mother told everyone to leave. (Id.) Waters asked petitioner to take

her home, so Williams and Waters got into petitioner's car to leave. (Id.) Petitioner took Waters

to two different houses but no one was at either house, so Waters remained in the car. (Id.) She

said that her father was going to be upset because it was getting late and petitioner told her she

had to do something because he had to go to work. (Id. at 26.)

Petitioner admitted that he was drinking and Waters was not, but she started getting mad

and began to kick and punch him. (Id.) Waters told him she had wanted to go to Fullerton and

1   petitioner reminded her that he was going to Los Angeles.  (Id.)  At that point, Waters got angry

2   and pulled out a screwdriver from her purse and tried to stab petitioner.  (Id. at 27.)  Petitioner

3   took the screwdriver away from her, opened the car door and told her to get out.  (Id.)  Waters

4   started fighting with him and petitioner tried to calm her down and reassure her that he would

5   take her where she wanted to go.  (Id.)  Then Waters "came at" him again and when he pushed

6   her away, he unintentionally stabbed her in the neck and he saw her begin to bleed.  (Id.)  After

7   petitioner "jabbed" her with the screwdriver, he tried to reach for her but she pushed him back.

8   (Id. at 33.)  At this point, they are in the driveway of an alley, and after he told her she was

9   bleeding, she slowly squatted down.  (Id.)  Petitioner was scared and drove away.  (Id. at 27,

10  34.)

11          Petitioner then explained to the Board that he disagreed with the facts as portrayed in the

12  2002 Parole Board Report.  (Id. at 38.)  Specifically, he maintains that although the report stated

13  that he denied responsibility for the murder, he insisted that he has always taken responsibility

14  for the murder and that the author of the report got it wrong.[2]  (Id. at 39.)

15  G.      2007 Board Hearing

16          Petitioner had been incarcerated for approximately 19 years at the time of his January 11,

17  2007 parole suitability hearing.  (Id. at 93.)  This was petitioner's third parole suitability hearing.

18  (Id. at 85.)  His minimum parole date was May 17, 1997.  (Id. at 3.)

19          After reviewing the underlying facts of the commitment offense, the Board discussed

20  petitioner's criminal history.  As a juvenile, petitioner was arrested in 1976 for robbery and sent

21  to juvenile camp.  (Id. at 69-70.)  Then in June 1980, petitioner was arrested for assault with a

22  deadly weapon but the charge was later dismissed.  (Id. at 71-72.)  Then in September 1980,

23  petitioner was arrested for receiving stolen property and carrying a concealed weapon in a

24  vehicle.  (Id. at 72.)  Those were also dismissed.  (Id.)  Then in July 1983, petitioner was again

25

26          [2]  The petitioner also spent quite a bit of time explaining to the Board that any allegation
    of petitioner being perpetrator of any rape was false.  (Id. at 41, 51, 52-53, 59.)  Apparently
27  during the preliminary hearing, an expert testified that there was no trauma to Waters' vaginal or
    rectum areas (id. at 57-58), and, after physical examination, there was no apparent evidence of
28  sexual abuse (id. at 58-60).

1   arrested for robbery and convicted of grand theft of a purse.  (Id. at 74.)  After that, petitioner

2   was arrested for the commitment offense.  (Id.)

3          In discussing petitioner's social history, petitioner denied that he had ever had any gang

4   involvement.  (Id. at 77.)  He appeared to have had a normal family and upbringing.  (Id. at 78-

5   80.)  Petitioner used to drink a lot of beer and smoke marijuana, although he occasionally used

6   cocaine as well.  (Id. at 80-81.)

7          Petitioner has since achieved his GED while incarcerated.  (Id. at 87.)  Petitioner

8   completed Principles of Real Estate (id. at 89), entrepreneurship (id. at 91), and has taken several

9   other courses at Valley Adult School as well as academic classes offered at the prison (id. at 92-

10  93.).  Petitioner has also completed several self-help courses.  (Id. at 92-93, 107-109.)  In

11  addition, petitioner has been working in textiles and as well as being a sewing machine operator.

12  (Id. at 94, 101.)  He has not achieved any vocation (id. at 93), however, he had recently enrolled

13  in a paralegal course which takes approximately two years to complete.  (Id. at 88.)  He had

14  previously enrolled in welding in 1994, but did not complete it because of a lack of an instructor.

15  (Id. at 99.)  Petitioner has also attended AA actively since 2003.  (Id. at 103-104.)  Petitioner

16  recounted that he was only a periodic participant prior to that.  (Id. at 104.)  Petitioner could not

17  recite all the steps, but he was familiar with some of them and stated that he believes AA is

18  helpful.  (Id. at 105-107.)

19         Throughout his incarceration, petitioner received five 115s, the last one occurring in 1997

20  for refusing to work.  (Id. at 111.)  Petitioner has also received thirty-one 128s, the last one

21  occurring in October 2004 for violating the no smoking policy.  (Id.)  Many of the 128s occurred

22  within the workplace for being disrespectful, refusing to work, or being unwilling to follow

23  instructions.  (Id. at 112.)

24         Regarding petitioner's 2006 psychological evaluation, the doctor described him as having

25  antisocial behavior and a poly-substance abuse that is in remission.  (Id. at 113.)  The report

26  found that petitioner's violence potential within a controlled environment was lower than the

27  average inmate but the "significant risk factors and precursors to violence are a return to drugs-

28  slash-alcohol abuse and involvement in an irresponsible lifestyle."  (Id. at 113-114.)  Petitioner

had parole plans to live with his mother.  (<u>Id.</u> at 116.)  His family wrote support letters offering to help petitioner once released on parole.  (<u>Id.</u> at 117-120.)  Petitioner also appeared to have requested a lot of information from potential employers or programs in an effort to pursue several different avenues.  (<u>Id.</u> at 123-135.)

Ultimately, the Board denied parole.  First, it relied on the commitment offense, concluding that it was carried out in a very cruel and callous manner and a dispassionate and calculated manner.  (<u>Id.</u> at 154.)  The Board found that the victim was abused and defiled during the offense and that the motive of the crime were trivial and inexplicable.  (<u>Id.</u> at 154-155.)  The Board expressed disbelief that petitioner could stab the victim in the neck, see blood coming out of her neck and, as she was starting to collapse, turn around and drive away, knowing that it was 1:00 in the morning in an area that appeared sparsely populated.  (<u>Id.</u> at 155.)  The Board also noted that petitioner had an escalating pattern of criminal conduct and had failed previous grants of probation.  (<u>Id.</u> at 155-156.)  The Board commended petitioner's achievements academically (<u>id.</u> at 159), but were concerned that he failed to upgrade vocationally, especially when he was advised to do so at his prior parole hearing four years earlier.  (<u>Id.</u> at 156-157.)  The Board reviewed his institutional disciplinary reports and brought attention to the psychological report that stated he had antisocial behavior and poly-substance abuse in institutional remission.  (<u>Id.</u> at 157.)  The Board advised that petitioner needed "more documented self-help in order to face, discuss, understand, and cope with stress . . . [and] until progress is made, [petitioner] continues to be unpredictable and a threat to others."  (<u>Id.</u> at 158.)  The Board noted that petitioner's achievements were rather recent and stated that he needed to show an ability to maintain gains over an extended period of time.  (<u>Id.</u> at 159.)

C.      <u>State Court Decisions Regarding the 2006 Denial</u>

Petitioner filed a state habeas petition in superior court challenging the denial of his parole.  The superior court denied petitioner's petition on November 8, 2007.  (Resp. Ex. 2.)  The superior court concluded that there was some evidence to support the denial of parole.  (<u>Id.</u> at 2.)  Specifically, the court found that the motive for the commitment offense was very trivial in relation to the offense and that petitioner had abused, defiled, or mutilated the victim.  (<u>Id.</u>,

1    citing Cal. Code Regs., tit. 15, §§ 2404(c)(1)(B) and (c)(1)(C).)  The court also determined that

2    petitioner's previous criminal record and institutional disciplinary report sufficiently supported

3    the Board's denial.  (Id. at 3.)

4         The California Court of Appeal denied his petition.  (Resp. Ex. 4.)  The California

5    Supreme Court also denied his petition.  (Resp. Ex. 6.)  Petitioner thereafter filed the instant

6    petition on January 28, 2009.

7                                          **DISCUSSION**

8    A.    Standard of Review

9         A district court may not grant a petition challenging a state conviction or sentence on the

10   basis of a claim that was reviewed on the merits in state court unless the state court's

11   adjudication of the claim: "(1) resulted in a decision that was contrary to, or involved an

12   unreasonable application of, clearly established Federal law, as determined by the Supreme

13   Court of the United States; or (2) resulted in a decision that was based on an unreasonable

14   determination of the facts in light of the evidence presented in the State court proceeding."  28

15   U.S.C. 2254(d).  The first prong applies both to questions of law and to mixed questions of law

16   and fact, Williams (Terry) v. Taylor, 529 U.S. 362, 407-09 (2000), while the second prong

17   applies to decisions based on factual determinations, Miller-El v. Cockrell, 537 U.S. 322, 340

18   (2003).

19        A state court decision is "contrary to" Supreme Court authority, that is, falls under the

20   first clause of 2254(d)(1), only if "the state court arrives at a conclusion opposite to that reached

21   by [the Supreme] Court on a question of law or if the state court decides a case differently than

22   [the Supreme] Court has on a set of materially indistinguishable facts."  Williams (Terry), 529

23   U.S. at 412-13.  A state court decision is an "unreasonable application of" Supreme Court

24   authority, falls under the second clause of 2254(d)(1), if it correctly identifies the governing

25   legal principle from the Supreme Court's decisions but "unreasonably applies that principle to

26   the facts of the prisoner's case."  Id. at 413.  The federal court on habeas review may not issue

27   the writ "simply because that court concludes in its independent judgment that the relevant state-

28   court decision applied clearly established federal law erroneously or incorrectly."  Id. at 411.

1   Rather, the application must be "objectively unreasonable" to support granting the writ.  See id.

2   at 409.

3        "Factual determinations by state courts are presumed correct absent clear and convincing

4   evidence to the contrary."  Miller-El, 537 U.S. at 340.  Under 28 U.S.C. 2254(d)(2), a state court

5   decision "based on a factual determination will not be overturned on factual grounds unless

6   objectively unreasonable in light of the evidence presented in the state-court proceeding."

7   Miller-El, 537 U.S. at 340; see also Torres v. Prunty, 223 F.3d 1103, 1107 (9th Cir. 2000).

8        When there is no reasoned opinion from the highest state court to consider the

9   petitioner's claims, the court looks to the last reasoned opinion.  See Ylst v. Nunnemaker, 501

10  U.S. 797, 801-06 (1991); Shackleford v. Hubbard, 234 F.3d 1072, 1079, n.2 (9th Cir. 2000).  In

11  this case, the last reasoned opinion is that of the superior court denying petitioner's habeas

12  petition (Resp. Ex. 2).

13  B.   Petitioner's Claims

14       As grounds for federal habeas relief, petitioner asserts that the decision to deny parole

15  was not supported by "some evidence," and thus violated his right to due process.

16       The Due Process Clause does not, by itself, entitle a prisoner to release on parole in the

17  absence of some evidence of his or her "current dangerousness."  Hayward v. Marshall, 603 F.3d

18  546, 555, 561 (9th Cir. 2010) (en banc).  Under California law, however, "some evidence" of

19  current dangerousness is required in order to deny parole.  Id. at 562 (citing In re Lawrence, 44

20  Cal.4th 1181, 1205-06 (2008) and In re Shaputis, 44 Cal.4th 1241 (2008)).  This requirement

21  gives California prisoners a liberty interest protected by the federal constitutional guarantee of

22  due process in release on parole in the absence of "some evidence" of their current

23  dangerousness.  Cooke v. Solis, 606 F.3d 1206, 1213-1214 (9th Cir. 2010).

24       When a federal habeas court in this circuit is faced with a claim by a California prisoner

25  that his right to due process was violated because the denial of parole was not supported by

26  "some evidence," the court "need only decide whether the California judicial decision approving

27  the governor's decision rejecting parole was an 'unreasonable application'[] of the California

28  'some evidence' requirement, or was 'based on an unreasonable determination of the facts in

1   light of the evidence.'" Hayward, 603 F.3d at 562-63 (quoting 28 U.S.C. 2254(d)(1)-(2)); Cooke,

2   606 F.3d at 1213.  California's "some evidence" requirement was summarized in Hayward as

3   follows:

> As a matter of California law, 'the paramount consideration for both the Board
> and the Governor under the governing statutes is whether the inmate currently
> poses a threat to public safety.'  There must be 'some evidence' of such a threat,
> and an aggravated offense 'does not, in every case, provide evidence that the
> inmate is a current threat to public safety.'  The prisoner's aggravated offense
> does not establish current dangerousness 'unless the record also establishes that
> something in the prisoner's pre- or post- incarceration history, or his or her
> current demeanor and mental state' supports the inference of dangerousness.
> Thus, in California, the offense of conviction may be considered, but the
> consideration must address the determining factor, 'a current threat to public
> safety.'

10  Hayward, 603 F.3d at 562 (quoting Lawrence, 44 Cal.4th. at 1191, 1210-14); see Cooke, 606

11  F.3d at 1213-1214 (describing California's "some evidence" requirement).  Under California

12  law, "the aggravated nature of the crime does not in and of itself provide some evidence of

13  *current* dangerousness to the public unless the record also establishes something in the prisoner's

14  pre- or postincarceration history, or his or her current demeanor and mental state, indicates that

15  the implications regarding the prisoner's dangerousness that derive from his or her commission

16  of the commitment offense remain probative of the statutory determination of a continuing threat

17  to public safety." Lawrence, 44 Cal.4th at 1214 (emphasis in original); see Hayward, 603 F.3d

18  at 562 (same).

19      Even aside from petitioner's commitment offense and prior criminal record, there was

20  some evidence that petitioner posed a risk of current dangerousness.  In light of petitioner's

21  psychological report indicating his risk factors to a return to violence, the following provide

22  some evidence that petitioner is still currently dangerous:  petitioner had only been participating

23  in AA consistently for approximately four years; alcohol and drug abuse figured prominently in

24  the commitment offense; petitioner had received 31 counseling memoranda for misconduct,

25  including three since his prior parole hearing; petitioner had received five serious disciplinary

26  reports; and there was evidence that petitioner's parole plans were not substantial because he

27  appeared to be casting a wide net with no real focus or direction, making it unknown how

28  petitioner planned on supporting himself or establishing a degree of self-sufficiency, especially

1   in light of his lack of vocational training.

2       Although certainly, a considerable amount of time had passed since the offense was

3   committed, the state court reasonably determined that, notwithstanding the positive factors from

4   petitioner's good behavior in prison, the evidence indicated "that the implications regarding the

5   prisoner's dangerousness that derive from his [] commission of the commitment offense remain

6   probative of the statutory determination of a continuing threat to public safety." See Lawrence,

7   44 Cal.4th at 1214; Shaputis, 44 Cal.4th at 1260-61 ("As long as the . . . decision reflects *due*

8   *consideration of the specified factors* as applied to the individual prisoner in accordance with

9   applicable legal standards, the court's review is limited to ascertaining whether it is some

10  evidence in the record that supports the . . . decision.") (emphasis in original).

11      Accordingly, the state courts' denial of petitioner's claims was neither contrary to nor an

12  unreasonable application of petitioner's federal constitutional guarantee of due process, and

13  petitioner is not entitled to federal habeas relief.

**CONCLUSION**

15      The petition for a writ of habeas corpus is DENIED.

16      Rule 11(a) of the Rules Governing Section 2254 Cases now requires a district court to

17  rule on whether a petitioner is entitled to a certificate of appealability in the same order in which

18  the petition is denied.  Petitioner has failed to make a substantial showing that his claims

19  amounted to a denial of his constitutional rights or demonstrate that a reasonable jurist would

20  find the denial of his claim debatable or wrong.  Slack v. McDaniel, 529 U.S. 473, 484 (2000).

21  Consequently, no certificate of appealability is warranted in this case.

22      The clerk shall enter judgment and close the file.

23      IT IS SO ORDERED.

24  DATED: ___7/30/10___

_Ronald M. Whyte_

RONALD M. WHYTE
United States District Judge